UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

WILLIE LEE MOORE TONEY                              CIVIL ACTION

VERSUS                                             NO. 06-1111

JAMES MILLER, WARDEN                               SECTION "C" (6)

ORDER AND REASONS

This matter is before the Court on a petition for writ of habeas corpus by Willie Lee

Moore Toney, seeking relief pursuant to 28 U.S.C. § 2254.  The petitioner raises three claims for

relief from his October, 1999 conviction of two counts of armed robbery.  Upon a thorough

review of the trial and appellate records, the habeas petition, response, memoranda, and

applicable law, the Court has determined that petitioner's habeas corpus petition has merit.  For

the reasons set forth below, this petition is GRANTED.

I. BACKGROUND AND PROCEDURAL HISTORY

The petitioner is a prisoner of the state confined to the Washington Correctional Institute

in Angie, La.  Fed. Rec. Doc. 1 at 1.  He filed this federal application for writ of habeas corpus

dated January 13, 2006.  *Id*. at 23.  Petitioner was found guilty of two counts of armed robbery

in the 21st Judicial District Court for the Parish of Tangipahoa, State of Louisiana, on October

27, 1999.  *See* State Rec. Vol.3, pp. 8-9.  He was sentenced, on December 1, 1999, to thirty five

years imprisonment on each count, to be served concurrently with one another.   State Rec. Vol.

3, p. 11; *see also* State Rec. Vol. 2, *State v. Toney*, 2000-KA-1017, at p. 2 (La.App.1 Cir.

2/16/01).

      The following facts are taken from the Statement of Facts of the Louisiana Court of

Appeal, First Circuit :

> On March 1, 1999, Betsy Brantley and Randy Duhe were walking
> together outside the library on the campus of Southeastern
> Louisiana University whey they were robbed at gunpoint by a
> black male with a stocking pulled partially over his face.  The man
> had been standing near them for approximately fifteen minutes
> prior to the robbery.  He did not pull the stocking over his face
> until he approached the couple and spoke to them.  After the
> robbery he told the two to turn around and run.  They immediately
> reported the incident to the police.  Defendant was eventually
> identified as a suspect and was later positively identified by both
> victims as the man who robbed them.  Defendant was then arrested
> for two counts of armed robbery.

*State v. Toney*, 2000 KA 1017 (La. App. 1 Cir., 2/16/2001) (unpublished).

      Petitioner made a motion for appeal that was granted by the court on January 20, 2000.

State Rec. Vol. 3, pp. 44-45.   The Court of Appeal of Louisiana, First Circuit, affirmed

petitioner's conviction on February 16, 2001.   State Rec. Vol. 2.   The Louisiana Supreme Court

denied a subsequent application for writ of certiorari on February 1, 2002.   State Rec. Vol. 1.

Petitioner's conviction and sentence thus became final on May 3, 2002, when his time for

seeking a writ of certiorari from the United States Supreme Court expired.

      On January 28, 2004, petitioner filed an application for post conviction relief in the trial

court.   State Rec. Vol. 1.   The trial court denied his application "on the face of the pleadings" on

February 2, 2004.  *Id.*  His application for writ to the Louisiana First Circuit was initially denied

on May 17, 2004 because "[r]elator did not include a copy of the application for postconviction

relief, the court's ruling, and any documentation from the trial court record to support the claims

raised in the application for postconviction relief."  *Id.*  A subsequent application to the

Louisiana First Circuit was then denied on October 18, 2004.  *Id.*  The Louisiana Supreme Court

denied petitioner's application for supervisory/and or remedial writs on December 16, 2005.

Petitioner filed the instant petition in this Court, signed August January 13, 2006.  Rec. Doc. 1

at 23.

## II. PROCEDURAL REVIEW

### A. Custody Requirement

A petitioner must be "in custody" for a federal court to entertain a petition for habeas

relief. 28 U.S.C. § 2241(c); 28 U.S.C.§ 2254(a).  Physical incarceration satisfies the custody

requirement.  *See e.g., Maleng v. Cook*, 490 U.S. 488, 491, 109 S. Ct. 1923, 1925 (1989).  Here,

petitioner is incarcerated at the Washington Correctional Institute in Angie, La.  Rec. Doc. 1.

Accordingly, this condition of the Court's subject matter jurisdiction over petitioner's claim for

relief is satisfied.

### B. Venue

Under 28 U.S.C.A. § 2241(d), venue lies in the district in which the petitioner is

incarcerated or the district from which his conviction or sentence was obtained.  Petitioner is

incarcerated at the Washington Correctional Institute in Angie, Louisiana, which is in

Washington Parish, a parish that falls within the Eastern District of Louisiana under 28 U.S.C. §

98(a).  In addition, petitioner was convicted and sentenced in Tangipahoa Parish, which under 28

U.S.C. § 98(a) falls within the Eastern District of Louisiana.  Therefore, venue lies for this

petition under 28 U.S.C.A § 2241(d).

     *C. Exhaustion*

     Petitioner's claims appear to be exhausted as required by AEDPA.  Generally, exhaustion

of adequate state remedies is a "condition precedent to the invocation of federal judicial relief

under [28 U.S.C.§ 2254]."  *Preiser v. Rodriquez*, 411 U.S. 475, 489 (1973). To satisfy the

exhaustion requirement, the entirety of the factual allegations and legal theories presented to the

federal court must have been presented in a procedurally proper manner to the highest state

court, here the Louisiana Supreme Court.  *See e.g., Anderson v. Harless*, 459 U.S. 4, 6 (1982)

(holding a habeas petitioner must have "fairly presented" to the state courts the "substance" of

his federal habeas corpus claim) (quoting *Picard v. Connor*, 404 U.S. 270, 275 (1971); *Yohey v.

Collins*, 985 F.2d 222, 226 (5th Cir. 1993); *Rose v. Lundry*, 455 U.S. 509 (1982).  It is important

to note that the issues in a habeas petition could have been presented to the highest state court on

direct appeal, or in a state post-conviction proceeding; either is sufficient and both are not

required. *Brown v. Allen*, 344 U.S. 443, 447 (1953); *Myers v. Collins*, 919 F.2d 1074, 1075-77

(5th Cir. 1990).  The requirement of exhaustion is now codified by 28 U.S.C.§ 2254(b)(1), which

provides, *inter alia*, that habeas relief "shall not be granted unless it appears that (A) the

applicant has exhausted the remedies available in the courts of the State . . . ."  The other

statutory provisions providing exceptions to the exhaustion rule are inapplicable here.

Petitioner presents three claims for review in his federal habeas petition. These claims appear to have been raised in his application for post-conviction relief to the Louisiana Supreme Court.[1]  Accordingly, petitioner has satisfied AEDPA's exhaustion requirement.

### D. Timeliness

The state makes no argument in its response regarding the timeliness of the petition, and the Court, in its discretion, finds that the interests of justice would best be served by addressing the merits of the petition, because petitioner's substantial constitutional rights are implicated. *See Day v. McDonough*, 547 U.S. 198, 210 (2006).

### III. PETITIONER'S CLAIMS

### A. Standard of Review

AEDPA revised 28 U.S.C.§ 2254(d)(1) and (2), furnishing new standards of review for questions of fact, questions of law, and mixed questions of law and fact for habeas petitions. The statute now provides that if a state court has adjudicated a claim on the merits, pure questions of law and mixed questions of law and fact are reviewed under 28 U.S.C.§ 2254(d)(1). *Hill v. Johnson*, 210 F.3d 481, 485 (5th Cir. 2000).  Questions of fact are reviewed under 28 U.S.C.§ 2254(d)(2). *Id.*

---

[1] Petitioner's applications for writs from denial of post-conviction relief to the Louisiana First Circuit and Louisiana Supreme Court are missing from the record.  The three claims raised in the instant petition were raised in his application for post-conviction relief in the trial court, and the state does not argue in its response to the petition that petitioner has not exhausted his state court remedies.  Neither the Louisiana First Circuit or Supreme Court provided reasons for their denials.  In light of the absence of opposition on exhaustion grounds and because the record seems to be missing the relevant filings in their entirety, the Court will assume petitioner made the same claims in the Louisiana First Circuit and Louisiana Supreme Court that he made in his post-conviction in the trial court.

Regarding questions of law and mixed questions of law and fact, a federal court must

defer to the state court's decision unless it was "contrary to, or involved an unreasonable

application of, clearly established Federal law, as determined by the Supreme Court of the

United States." 28 U.S.C.§ 2254(d)(1).  The United States Supreme Court has noted:

> § 2254(d)(1)'s "contrary to" and "unreasonable application"
> clauses have independent meaning.  A federal habeas court may
> issue the writ under the "contrary to" clause if the state court
> applies a rule different from the governing law set forth in our
> cases, or if it decides a case differently than we have done on a set
> of materially indistinguishable facts. The court may grant relief
> under the "unreasonable application" clause if the state court
> correctly identifies the governing legal principle from our
> decisions but unreasonably applies it to the facts of the particular
> case. The focus of the latter inquiry is on whether the state court's
> application of clearly established federal law is objectively
> unreasonable, and . . . an unreasonable application is different from
> an incorrect one.

*Bell v. Cone*, 535 U.S. 685, 694 (2002) (internal citations omitted). As to questions of fact, a

state court's factual findings are presumed to be correct and a federal court "will give deference

to the state court's decision unless it was based on an unreasonable determination of the facts in

light of the evidence presented in the state court proceeding." *Hill*, 210 F.3d at 485; 28 U.S.C.§

2254(e)(1).

### B. Petitioner's Claims

Petitioner raises the following claims in his petition:

1.     The state trial court erroneously denied petitioner's actual innocence claim;

2.     The state trial court erroneously denied petitioner's claim for alibi witness testimony;

6

3.      The trial court erroneously denied petitioner's claim of ineffective assistance of counsel.

The petitioner raised his second claim on direct review and each of his claims in his post-conviction relief proceedings.  The state argues that the state courts properly determined each claim to be without merit.

### C. First Claim : Actual innocence; Insufficiency of the Evidence

In his first claim, petitioner argues that the state trial court, and then the state appellate and supreme courts in denying his writ applications, erred in denying his actual innocence claim. First, he claims that he is innocent of the crime committed.  He then claims that the state produced insufficient evidence to prove him guilty beyond a reasonable doubt of each element of the crime, as required by the due process clause of the Fourteenth Amendment.

A claim of insufficiency of the evidence is a mixed question of law and fact, requiring this Court to examine whether the state court's denial of relief was contrary to or an unreasonable application of clearly established United States Supreme Court precedent.  *Penry v. Johnson*, 215 F.3d 504, 507 (5th Cir. 2000).  More specifically, this Court must determine whether the state courts reasonably applied the due process standard set out in *Jackson v. Virginia*, 443 U.S. 307, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979).  *See also Guzman v. Lensing*, 934 F.2d 80, 82 (5th Cir. 1991).   In reviewing a claim of insufficiency of the evidence, a court must determine whether, looking at the elements of the offense, and viewing the evidence in the light most favorable to the prosecution, a rational finder of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson*, 443 U.S. at 319.  Here, the key issue is not whether the crimes of armed robbery were committed, but whether petitioner committed

7

them.  Under Louisiana law, when identity is disputed, the state must negate any reasonable probability of misidentification in order to satisfy its burden of proof employing the *Jackson* standard.  *State v. Smith*, 430 So.2d 31, 45 (La. 1983).  That is, this Court must determine whether the state court reasonably determined, in viewing all of the evidence in the light most favorable to the prosecution, a rational jury could have concluded that the state negated any reasonable probability of misidentification.

Based on the evidence produced at trial, this standard was met.  The state produced the eyewitness testimony of the two victims of the robbery, Betsy Brantley and Randy Duhe, who both identified petitioner as the perpetrator at trial.  Both had independently picked petitioner's photograph out of a photographic lineup.  State Rec. Vol. 3 at 230-31; Vol. 4 at 251   In addition, the testimony of two other witnesses tended to corroborate that petitioner had committed the robbery: Alex Lambert and Ben Broussard, two students at the university, testified that they watched a man who matched a description of the robber, though not without inconsistency,[2] run from the general location and at the general time of the robbery to a car parked outside of the dorm.  *Id.* at 274, 291.  They testified this car was distinctive: it was a big, old, baby blue colored, American model with spokes and a dent on the left side.  *Id.* at 275-76, 291, 297.  The car had trouble starting and was very noisy.  *Id.* at 275, 292.  After a police officer investigating

_____

[2]  Victim Betsy Brantley testified that the perpetrator was wearing a red basketball jersey, with black and white piping (perhaps a Chicago Bulls jersey), with a white short-sleeved T-shirt underneath.  State Rec. Vol. 3 at 203-04, 222, and light or neutral colored panty-hose which he wore over his face during the robbery.  *Id.* at 204, 218. Randy Duhe, the other victim, generally confirmed this description, *id.* at 248, although he could not remember whether the robber was wearing a shirt underneath the jersey or not.  *Id.* at 269.  However, Lambert testified that the person he witnessed running to the baby blue car was wearing a stocking cap or panty hose on his head that was maybe brown or dark brown, and was wearing a black "starter" jacket (that is a big, long sleeved jacket, per Lambert's description). *Id.* at 298.  Broussard testified that the he saw the individual wearing an article of clothing that "was like a basketball jersey," though he could not recall its colors.  *Id.* at 274.

the case noticed the defendant in a car matching Lambert and Broussard's description (he

noticed the car because of the noise it made when its occupants tried to start it, *id.* at 339), he

photographed the vehicle.  *Id.*  Lambert and Broussard immediately identified the vehicle as the

one they saw at the night of the incident,  *id.* at 340, and later confirmed this identification when

the police drove them past the car.  *Id.* at 276, 296, 308, 340.   Subsequent to this confirmation,

the investigator included petitioner's photograph in a lineup, which, as noted above, the victims

almost immediately identified as being of the perpetrator.  Furthermore, petitioner did not

present an alibi defense at trial that would have undermined the state's case.[3]  Therefore, the

state court reasonably determined that the jury could have concluded the state had negated any

reasonable probability of misidentification, and that there was sufficient evidence to sustain the

verdict.

### D. Petitioner's Second Claim: Trial Court Erroneously Prevented Petitioner from Presenting Alibi Witness Testimony

Petitioner claims that the trial court erred in refusing to allow the testimony of two alibi

witnesses, his sister, Mammie Lee Gails, and Samatha Stewart, his girlfriend.  The trial court

excluded any such alibi testimony because petitioner had failed to provide notice of alibi to the

district attorney as required by LA. C.CR.P. Art. 727.  Art. 727(A) provides that, upon written

demand of the district attorney the defendant shall respond within ten days of his intent to offer

---

[3] Petitioner's failure to raise an alibi defense is the subject of his second and third claims, and the effect of this failure is discussed below.

an alibi defense.[4]   In addition, section (D) provides that the court may exclude the testimony of

any undisclosed alibi witness upon the failure of defendant to comply with the requirements of

the rule.  LA. C.CR.P. ART. 727(D) (this rule further states that it "shall not limit the right of the

defendant to testify in his own behalf").

Here, petitioner did not provide the required notice within ten days of the district

attorney's June 2, 1999 motion for discovery and inspection, in which it demanded information

on petitioner's intention to offer a defense of alibi.  State Rec. Vol. 3 at 33.  This motion stated

the time, date, and place at which the alleged offense was committed, in compliance with the

district attorney's obligations under Art. 727(A).  Petitioner's original "Answer to Motion for

Discovery and Inspection" was filed into the record on May 28, 1999,[5] indicating, in response to

the state's question whether defendant intended to produce evidence at trial concerning alibi,

"[u]nknown at this time.  If there is an alibi, the information will be furnished when acquires

[sic]." State Rec Vol. 3 at 32, ¶ 3.  Instead, defense counsel provided notice to the state of two

alibi witnesses, petitioner's sister and girlfriend, immediately before trial.  *Id.* at 162-63.  A

hearing was held on the issue after the jury was selected but prior to opening arguments.  *Id.* at

163-180.  Defense counsel, Lloyd Sibley, of Office of the Public Defender, had apparently only

recently been assigned to the case.  It appears he had taken over the entire caseload of the

---

[4] Art. 727(A) reads in its entirety: "Upon written demand of the district attorney stating the time, date, and place at which the alleged offense was committed, the defendant shall serve within ten days, or at such different time as the court may direct, upon the district attorney a written notice of his intention to offer a defense of alibi. Such notice by the defendant shall state the specific place or places at which the defendant claims to have been at the time of the alleged offense and the names and addresses of the witnesses upon whom he intends to rely to establish such alibi."

[5] The confusion caused by the apparent discrepancy of the answer to the state's motion being filed before the filing of the motion itself was addressed by the trial court during a bench conference at trial - it has something to do with setting the motion for a motion date.  State Rec. Vol. 4 at 390.  This discrepancy does not change the untimeliness of the alibi notice.

petitioner's former attorney, C. Reid, including this case, for reasons undisclosed in the record, and had only learned of one alibi witness, Samantha Stewart, fifteen to twenty minutes prior to the hearing, presumably from the defendant himself. *Id.* at 165, 169; *see also Id.* at 170.    The prior attorney, Mr. Reid, had orally represented to the district attorney's office approximately in July that the defendant had an alibi witness, apparently his sister. State Rec. Vol. 4 at 389. The prosecutor stated, at a bench conference on the second day of trial, that "[t]here was a representation that was made to me back in July I think it was, that this defendant says he has an alibi witness.  He says I don't know who it is, I don't know an address, but I am just telling you this, that is what Mr. Reid told me.  The first notice of actual [sic] who the alibi witness was we received at lunch yesterday." *Id.*

Defense counsel attempted to argue, even though Art. 727 had not been strictly complied with, that the defense had good cause such that the court could grant an exception to the requirement of subsection A, and allow the alibi witnesses to testify.[6] *Id.* at 169-180.  After defense counsel indicated that the Office of the Public Defender had not obtained knowledge of the identity of the additional witness, Samantha Stewart, until that morning, the court expressed its suggestion that perhaps the defendant himself, as opposed to the Office of the Public Defender, was tardy. *Id.* at 177.  Counsel stated that the "defendant represented that he did not provide Mr. Reid with the witness because of the fact that he did not know her address, which was requested.  And he learned of that this morning..." *Id.* at 179.[7]  The court balked at this:

---

[6]Art. 727(E) provides that "[f]or good cause shown, the court may grant an exception to any of the requirements of Subsections A through D of this Section."

[7] It is unclear in the record from whom petitioner received this information.  At one point, Sibley asked when precisely he learned Stewart's address.  He replied, "She went and got the address this morning," with no further indication who "she" was. *Id.* at 178.

"You're telling me he knew who the alibi was, just didn't know where she lived?  And for some reason, since he didn't know where she lived, he thought it wasn't relative [sic] to ... tell his attorney?"  *Id.*  at 178.  The Court found that this was not good cause, and ruled that Samantha Stewart could not testify as to a defense of alibi.  *Id.* at 179-180.  Defense counsel promptly objected.  *Id.*  at 180.

At the bench conference on the second day of trial, the judge discovered he had erroneously believed that proper notice had been given as to the sister, but not as to petitioner's girlfriend.  However, proper notice had not been given as to either, and he ruled that neither could testify as to alibi.  *Id.* at 393.

Enforcement of the Louisiana notice-of-alibi rule in Art. 727 through exclusion of defense witnesses clearly implicates petitioner's constitutional rights.  The Sixth Amendment Compulsory Process Clause and due process require that a criminal defendant be permitted to offer testimony of witnesses in his defense.  *Washington v. Texas*, 388 U.S. 14 (1967).  This includes the right to have the witness' testimony be heard by the trier of fact.  *Taylor v. Illinois*, 484 U.S. 400, 409 (1988).  Indeed, "[f]ew rights are more fundamental than that of an accused to present witnesses in his own defense." *Chambers v. Mississippi*, 410 U.S. 284, 302 (1973).  The United States Supreme Court held that a similar alibi notice rule in Florida did not violate a criminal defendant's due process rights and did not deprive him of a fair trial, or compel himself to be a witness against himself, in violation of the Fifth, Sixth and Fourteenth Amendments.  *Williams v. Florida*, 399 U.S. 78 (1970).  The Court deferred, however, questions of the validity

of the threatened *sanction*, that is, exclusion, which it noted would raise Sixth Amendment issues. *Id*. at 83 n.14.

The Court has since ruled that the Compulsory Process Clause of the Sixth Amendment may, in certain cases, be violated by the imposition of a discovery sanction that entirely excludes the testimony of a material defense witness. *Taylor*, 484 U.S. at 409. However, the Court also held that the Sixth Amendment does not create an absolute bar to the preclusion of the testimony of a surprise defense witness. *Id.* at 410. *Taylor* involved the failure of the defendant to include the names and addresses of two witnesses in response to the prosecution's discovery motion requesting a list of defense witnesses, pursuant to a general Illinois discovery rule. *Id.* at 403. The logic and holding of *Taylor* clearly extend to the application and enforcement of notice-of-alibi rules, and several courts of appeals have applied it to instances of exclusion based on such rules. *See, e.g., Wade v. Herbert*, 391 F.3d 135 (2nd Cir. 2004); *U.S. v. Nelson-Rodriguez*, 319 F.3d 12 (1st Cir. 2003); *Grooms v. Solem*, 923 F.2d 88 (8th Cir. 1991).[8]

While a "trial court may not ignore the fundamental character of the defendant's right to offer testimony of witnesses in his favor," that right does not "automatically and invariably outweigh countervailing public interests." *Taylor*, 484 U.S. at 414. The right must be weighed against "the integrity of the adversary process, which depends both on the presentation of reliable evidence and the rejection of unreliable evidence, the interest in the fair and efficient

---

[8] The federal Fifth Circuit has not had occasion to apply *Taylor* in the context of a state or federal notice-of-alibi rule since that case was decided in 1988. Prior to *Taylor*, however, the court had held that the Compulsory Process Clause of the Sixth Amendment forbids the exclusion of otherwise admissible evidence solely as a sanction to enforce discovery rules or orders against criminal defendants, expressly answering the question the Supreme Court had left open in *Williams*. *U.S. v. Davis*, 639 F.2d 239 (5th Cir. 1981); *see also Taliaferro v. Maryland*, 461 U.S. 948(White, J., dissenting from denial of writ of ceriorari) (citing *Davis*). This broader holding, forbidding the exclusion of witnesses as a sanction against criminal defendants in all cases, has been limited somewhat by *Taylor*.

administration of justice, and the potential prejudice to the truth determining function of the trial

process." *Id.* at 414-15; *see also U.S. v. Mizell*, 88 F.3d 288, 294 (5th Cir. 1996).   Of

significance in its balancing of the factors in *Taylor* itself, the Court considered the state's

interest "in protecting itself against an eleventh-hour defense," and the purpose of discovery to

"minimize the risk that a judgment will be predicated on incomplete, misleading, or even

deliberately fabricated testimony." *Id.* at 411-12.  The Court further stated that:

> A trial judge may certainly insist on an explanation for a party's
> failure to comply with a request to identify his or her witnesses in
> advance of trial.  If that explanation reveals that the omission was
> willful and motivated by a desire to obtain a tactical advantage that
> would minimize the effectiveness of cross-examination and the
> ability to adduce rebuttal evidence, it would be entirely consistent
> with the purposes of the Compulsory Process Clause simply to
> exclude the witness' testimony.

*Id.* at 415.

However, the Court stated that "alternative sanctions are adequate and appropriate in

most cases," and that "the reasons for restricting the use of the exclusion sanction to only the

most extreme situations are ... compelling in the case of criminal defendants, where due process

requires that a defendant be permitted to offer testimony of witnesses in his defense."  *Id.* at 413,

417 n.23; *see also Mizell*, 88 F.3d at 294.  The Court noted examples of possible alternative

sanctions:

> Prejudice to the prosecution could be minimized by granting a
> continuance or a mistrial to provide time for further investigation;
> moreover, further violations can be deterred by disciplinary
> sanctions against the defendant or defense counsel.

14

*Taylor*, 484 U.S. at 413.  Several years after *Taylor*, the Court reiterated that there is no *per se*

bar against the exclusion of testimony for failure to comply with discovery rules, in the context

of the notice provisions of Michigan's rape-shield law.  *Michigan v. Lucas*, 500 U.S. 145 (1991).

 However, the Court further explained its prior holding: "We did not hold in *Taylor* that

preclusion is permissible every time a discovery rule is violated.  Rather, we acknowledged that

alternative sanctions would be 'adequate and appropriate in most cases.'" *Id.* at 152 (quoting

*Taylor*, 484 U.S. at 413).  The Court also noted that "[r]estrictions on a criminal defendant's

right ... to present evidence 'may not be arbitrary or disproportionate to the purposes they are

designed to serve.'" *Id.* at 151 (quoting *Rock v. Arkansas*, 483 U.S. 44, 56 (1987)); *see also*

*Bowling v. Vose*, 3 F.2d 559, 562 (1st Cir. 1993) (stating that "[u]ndoubtedly the interest in the

fair and efficient administration of justice is burdened by the introduction of a new defense

theory after the government has closed its evidence.  Alternative remedies exist however, which

adequately and appropriately address fairness and efficiency").

In *Taylor*, where defense counsel did not apprise the court or the prosecution of the two

additional witnesses until the second day of trial, after the state's two principal witnesses had

completed their testimony, the Court found that the "inference that he was deliberately seeking a

tactical advantage is inescapable." *Taylor*, 484 U.S. at 417.  It concluded that "it is plain that the

case fits into the category of willful misconduct in which the severest sanction [of exclusion] is

appropriate." *Id.*  Here, however, there is no suggestion at all that defense counsel waited until

the day of trial to notify the state of alibi witnesses in a willful attempt to gain tactical advantage.

Defense counsel had only recently been appointed to the case, and did not learn of Samantha

Stewart's name or even existence as a potential witness until fifteen or twenty minutes before he relayed that information to the prosecution.  Indeed, any suggestion of willfulness or attempt to gain tactical advantage is undermined by the fact that the police had been told during the initial investigation by both petitioner's sister and his girlfriend that he could not have committed the robbery based on their knowledge of his whereabouts at the time of the crime.  In addition, petitioner's former counsel had apparently made an oral representation to the prosecutor that petitioner had told him of the existence of an alibi witness.  State Rec. Vol. 3 at 167-68. Under the circumstances, there is no indication that the petitioner himself was attempting to gain any tactical advantage by contributing to the failure to give notice of alibi in a timely fashion.

The lack of willfulness and attempt to gain tactical advantage significantly undermines the justification for exclusion in light of defendant's right to compulsory process; most cases upholding the preclusion of an alibi defense have involved willful misconduct by the defense. *U.S. v Portela*, 167 F.3d 687 (1st Cir.1999), *citing Bowling*, 3 F.3d at 561-62 (collecting cases). Indeed, the Ninth Circuit has even held that under *Taylor*, only willful discovery violations justify the sanction of exclusion. *See U.S. v. Peters*, 937 F.2d 1422, 1426 (9th Cir. 1991).  While such a rule may go too far in some cases, there is no question that the state trial and appellate court should have considered the lack of willfulness before imposing the "severest sanction" of exclusion.

In addition, there was not the significant threat of irreparable prejudice to the prosecution in this case that exists in many.  *See Wade*, 391 F.3d at 144 (considering the difficulty the prosecution would have finding witnesses who could remember the events of a crime four years

past to rebut newfound alibi witness' story, where defendant had fled to another city and used a false name for three years).  In a case like *Wade*, the less severe remedy of continuing trial can do little to mitigate the prejudice to the prosecution, which may be unable to find witnesses who could remember details to rebut an alibi to a long past crime.  Here, the robbery had occurred on March 1, 1999.  Trial was held in October of the same year, a relatively brief period of time after the crime.  Furthermore, as noted above, the prosecution and police had at least some actual knowledge of the existence and nature of Gails and Stewart's likely testimony, and they were readily available for further investigation.  Thus the prejudice to the prosecution that would have resulted from the imposition of a continuance would have been minor.  The *Taylor* Court recognized the role of discovery rules in minimizing the risk that fabricated testimony will be believed.  *Taylor*, 484 U.S. at 413-14.  Here, while there is no guarantee that the testimony of petitioner's sister and girlfriend would not have been fabricated, there is no reason to believe such a possibility was compounded by the eleventh-hour nature of the formal notice.  Both witnesses indicated to the police the nature of their alibi testimony very soon after the crime. Any biases or weaknesses in their testimony was properly for cross-examination by the government to reveal, and their credibility for the jury to assess.

Despite *Taylor*'s recognition of the fundamental nature of petitioner's Sixth Amendment Right to Compulsory Process, including the right to have a witness' testimony heard by the trier of fact, and the balancing that must be employed before the "severest" sanction of exclusion is imposed, there is no evidence that the trial court here even weighed the relevant factors.  The transcript of the hearing on the prosecution's motion reveals that the court was focused almost

exclusively on whether the notice-of-alibi rule had been complied with, and seemed to envision only exclusion as a necessary sanction if it had not.  *See e.g.*, Vol. 3 at 170.[9]  The court's consideration of "good cause" consisted only of inquiry into defendant's failure to inform counsel of the existence of Samantha Stewart because he did not know her address and his duty to aid in his own defense.  There was no inquiry whatsoever into cause for the failure to timely notify the prosecution of his intention to offer his sister as an alibi witness.[10]  Although the Louisiana First Circuit on appeal noted that defense counsel argued prior to the court's ruling that the state had knowledge of both witnesses because each of them had spoken with one of the investigating officers, *Toney*, 2000-KA-1017 at 6, this was not argued in the context of the effect such partial notice had on the prejudice to the state.  It appears the trial court did not consider the degree of prejudice to the state, the willfulness of defendant's failure to give notice, or whether the failure stemmed from an attempt to gain tactical advantage.

Just as importantly, the trial court displayed no consideration of any alternative sanctions or remedies short of exclusion of defendant's witnesses, such as a continuance of the trial to afford the prosecution an opportunity to investigate the witnesses' accounts.  Indeed, it appears that the court felt compelled by the rule, once it found that the rule had not been complied with, to exclude any testimony of alibi.  *See supra*, note 8.  The appellate court went further than the

---

[9] The court stated: "If answers weren't given timely – I guess what I'm saying is, is that we're going strictly by the law.  If there's been no traversals; if it has not been properly complied with from a general discovery stand-point, there's not much I can do at this time."  *Id.*

[10] The failure to properly notify the prosecution of petitioner's intention to offer his sister, in particular, as an alibi witness raises serious ineffectiveness of counsel concerns, as petitioner told Reid she would act as an alibi witness, and he surely knew and could have told counsel of her address; he apparently lived with her.  State Rec. Vol. 3 at 165-66, Vol. 4 at 402.  Petitioner's claim of ineffectiveness of counsel with regards to the failure to give proper notice-of-alibi is discussed below.

18

trial court and weighed factors to be considered "in determining whether the trial court properly exercised its discretionary power to exclude the testimony of an undisclosed witness." *Toney*, 2000-KA-1017 at 7.[11]  In particular, it considered the prejudice to the prosecution, but it only considered such prejudice as if the specific trial setting was a given, rather than in consideration of the possibility of continuing the trial.  Again, there was apparently no willful attempt by the petitioner to gain a tactical advantage in this case by waiting until the last minute to properly notify the prosecution of his alibi witnesses, and there was no argument presented that the prosecution would have been irreparably prejudiced in its investigation if a continuance had been ordered.  *See Bowling*, 3 F.3d at 562.

Without any evidence of willfulness on the part of the petitioner or the likelihood of significant prejudice to the state had a continuance been ordered, and in light of the fact that the prosecution had some actual knowledge of petitioner's alibi witnesses, a less severe sanction than the exclusion of both witnesses' alibi testimony would have been "adequate and appropriate" in this case. *Taylor*, 484 U.S. at 413.  As such, the Court finds that the trial court erred in excluding the witnesses' alibi testimony, in violation of petitioner's Sixth Amendment right to compulsory process.  In addition, because the state appellate court failed to apply *Taylor*

---

[11] The trial court, in contrast, acted as if it had no such discretion.  The appellate court applied the factors set out in *U.S. v. Myers*, 550 F.2d 1036 (5th Cir. 1977) to be considered by a trial court prior to exclusion of the testimony of an undisclosed witness under the federal notice-of-alibi rule, FED.R.CR.P 12.1.  Such factors are: (1) the amount of prejudice that resulted from the failure to disclose, (2) the reason for nondisclosure, (3) the extent to which the harm caused by nondisclosure was mitigated by subsequent events, (4) the weight of the properly admitted evidence supporting the defendant's guilt, and (5) other relevant factors arising out of the circumstances of the case. Id. at 1043.  While the federal rule is identical to Art. 727, *Myers* was decided long before *Taylor*.  And although the factors set forth in *Myers* are generally similar to those set forth in *Taylor*, lacking is any guidance to a court to inquire about willfulness, attempt to gain tactical advantage, and the possibility of other sanctions short of exclusion. Because the Court finds that the trial court failed to fully consider the relevant factors under *Taylor*, it need not decide whether full-fledged application of the *Myers* factors might have sufficed in this case.

19

and the relevant factors set out therein, including consideration of the possibility of less severe sanctions such as continuation of the trial, the Court finds that its decision was contrary to clearly established federal law as determined by United States Supreme Court precedent.

Even where the trial court has abused its discretion in excluding petitioner's alibi witnesses, such an error would only entitle petitioner to relief if such an error was not harmless. *Mitzell*, 88 F.3d at 295.  The Court will consider the harmlessness of the error in section F, below.

### E. Petitioner's Third Claim: Ineffectiveness of Counsel for Failure to Investigate and Provide Proper Notice of Alibi Defense

Petitioner also argues that his trial counsel was ineffective, in violation of his Sixth Amendment right to counsel, for failing to investigate exculpatory witnesses or properly notify the prosecution of his alibi witnesses.

In *Strickland v. Washington*, 466 U.S. 668 (1984), the United States Supreme Court established a two-prong test for evaluating claims of ineffective assistance of counsel.  A petitioner seeking relief must demonstrate both (1) counsel's performance was deficient *and* (2) that the deficient performance prejudiced his defense.  *Strickland*, 466 U.S. at 687.

To prevail on the deficiency prong, petitioner must demonstrate that counsel's conduct fails to meet the constitutional minimum guaranteed by the Sixth Amendment.  *Styron v. Johnson*, 262 F.3d 438, 450 (5th Cir. 2001), *cert. denied*, 534 U.S. 1163 (2002).  "Counsel's performance is deficient if it falls below an objective standard of reasonableness."  *Little v. Johnson*, 162 F.3d 855, 860 (5th Cir. 1998).  An analysis of an attorney's performance must take

20

into account the reasonableness of counsel's actions in light of all the circumstances. *Strickland*, 466 U.S. at 689. "[I]t is necessary to judge . . . counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct." *Lockhart v. Fretwell*, 506 U.S. 364, 371 (1993) (quoting *Strickland*, 466 U.S. at 690). Petitioner must overcome a strong presumption that the conduct of his counsel falls within a wide range of reasonable representation. *Crockett v. McCotter*, 796 F.2d 787, 791 (5th Cir. 1986); *Mattheson v. King*, 751 F.2d 1432, 1441 (5th Cir. 1985).

In order to prove prejudice with respect to trial counsel, petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. In this context, a reasonable probability is "a probability sufficient to undermine confidence in the outcome." *Id.* The Fifth Circuit has adopted the *Strickland* test holding: "[d]eficient performance is prejudicial only upon a showing that but for counsel's errors, there is a reasonable probability that the ultimate result would have been different and that confidence in the reliability of the verdict is undermined." *Little*, 162 F. 3d at 860-61. In making a determination as to whether prejudice occurred, courts must review the record to determine "the relative role that the alleged trial errors played in the total context of [the] trial." *Crockett*, 796 F.2d at 793.

It is important to note that petitioners bear the burden of proof when asserting a claim for ineffective assistance of counsel. Petitioner "must demonstrate, by a preponderance of the evidence, that his counsel was ineffective." *Jernigan v. Collins*, 980 F.2d 292, 296 (5th Cir. 1993); *see also, Clark v. Johnson*, 227 F.3d 273, 284 (5th Cir. 2000). If a court finds that

21

petitioner has made an insufficient showing as to either of the two prongs of inquiry, i.e.,
deficient performance or actual prejudice, it may dispose of the claim without addressing the
other prong.  *Strickland*, 466 U.S. at 697.  Furthermore, a claim of ineffective assistance of
counsel is a mixed question of law and fact.  *Moore v. Cockrell*, 313 F.3d 880, 881 (5th Cir.
2002), *cert. denied*, 538 U.S. 969 (2003).  Therefore, this Court must defer to the state court on
these claims unless that decision "was contrary to, or involved an unreasonable application of,
clearly established Federal law, as determined by the Supreme Court of the United States." 28
U.S.C.§ 2254(d)(1).

   The facts underlying petitioner's claim are set out at length above in the discussion of his
first two claims.  In *Taylor*, the Court rejected an argument that the client should not be held
responsible for his lawyer's misconduct:

> The adversary process could not function effectively if every
> tactical decision required client approval...[i]n responding to
> discovery, the client has a duty to be candid and forthcoming with
> the lawyer, and when the lawyer responds, he or she speaks for the
> client.  Putting to one side the exceptional cases in which counsel
> is ineffective, the client must accept the consequences of the
> lawyer's decision to forgo cross-examination, to decide not to put
> certain witnesses on the stand, or to decide not to disclose the
> identity of certain witnesses in advance of trial.

*Taylor*, 484 U.S. at 418.  Here, petitioner is arguing that this is one of those exceptional cases
where his counsel was ineffective.  The failure of his counsel to notify the prosecution of his
alibi witnesses until the day of trial in this case was not rooted in the deliberate seeking of
tactical advantage that was apparent in *Taylor*.  Instead, the failure appears rooted in
incompetence, or at least inadvertence.

22

The defendant here can perhaps be faulted somewhat for privately concluding that because he did not know Samantha Stewart's address, it was pointless to inform his counsel or the prosecution of her name.  But he did, in the very least, tell his original counsel (Mr. Reid) enough that Reid knew to orally indicate to the district attorney an alibi notice might be forthcoming.   Indeed, it seems that had counsel made any reasonable inquiry to defendant at all, he could have readily elucidated Stewart's name and investigated further to obtain her address.[12] Ultimately, it was petitioner who obtained Stewart's address and provided it to his trial counsel (Mr. Sibley). State Rec. Vol. 3 at 178.  In addition, petitioner did tell Reid that his sister would be an alibi witness.  *Id.* at 173.  No excuse was given by Sibley for the failure to properly notify the state concerning his sister.

The duty to make reasonable investigations is an essential part of the reasonableness of counsel's performance:

> [S]trategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary.

*Strickland*, 466 U.S. at 690-91.  The complete failure to investigate and interview potential alibi witnesses is not a strategic choice that is to be afforded deference, especially where, as here, such an alibi along with his theory of misidentification comprised petitioner's entire defense.

---

[12] Again, the Court notes that all indications are that this was not an alibi fabricated at the "eleventh hour." Both Stewart and petitioner's sister told the police that defendant could not have committed the crime because he was with/was seen by them, shortly after the crime and while the investigation was ongoing.

23

*See Bryant v. Scott*, 28 F.3d 1411 (5th Cir. 1994) (finding counsel's complete failure to investigate alibi witnesses fell below standard of reasonably competent attorney practicing under prevailing professional norms).   The Fifth Circuit in *Bryant* considered at length counsel's failure to investigate in the specific context of a defendant's alibi defense:

> [A]n attorney must engage in a reasonable amount of pretrial
> investigation and 'at a minimum, ... interview potential witnesses
> and ... make an independent investigation of the facts and
> circumstances in the case.' [*Nealy v. Cabana*, 764 F.2d 1173, 1177
> (5th Cir. 1985).]  The failure to interview eyewitnesses to a crime
> may strongly support a claims of ineffective assistance of counsel,
> *see Gray v. Lucas*, 677 F.2d 1086, 1093 n.5 (5th Cir. 1982) (noting
> that attorney's failure to investigate crucial witness may constitute
> inadequate performance), *cert. denied*, [461 U.S. 910 (1983)], and
> when alibi witnesses are involved, it is unreasonable for counsel
> not to try to contact the witnesses and 'ascertain whether their
> testimony would aid the defense.' [*Grooms*, 923 F.2d at 90].

*Bryant*, 28 F.3d at 1415.  Here, this Court can discern nothing in the record that indicates counsel made any effort to contact petitioner's alibi witnesses, or make any independent investigation into the facts and circumstances of the case.[13]

The State argues that "[s]ince counsel stated that he had only just become aware of the existence of an alibi defense, it cannot be said that he was deficient in failing to provide notice." Rec. Doc. 6 at 5.  However, this reasoning ignores that petitioner's counsel in this case included more than one attorney, each with the Office of the Public Defender.  It is not only the performance of the attorney who ultimately (and apparently on short notice) represented petitioner at trial that is at issue.  Indeed, it was petitioner's original attorney who knew from

---

[13] Petitioner claims in his petition that "Counsel conceded that he relied exclusively on the investigative work of the State and based his own pretrial 'investigation' on assumptions divined from a review of the State's files." Rec. Doc. 15 at 21.  While there is little in the record that causes the Court to doubt petitioner's assertion, petitioner does not cite to any specific "concession" by counsel in the record, and the Court can not find one.

petitioner of potential alibi witnesses, but made no effort to investigate, and it was he who failed to provide the notice-of-alibi in a timely fashion.  (Any such notice would have been untimely - it was due sometime in June of 1999 - well before Sibley took over.  *See* Minute Entries, State Rec. Vol. 3 at 4-6.)  Both attorneys can be faulted for failing to coordinate and communicate about the course of the preparation for trial prior to Sibley taking over the case.  Indeed, petitioner's counsel for the purposes of the Sixth Amendment was the Office of the Public Defender and not any one attorney in particular.  The Office failed to make reasonable investigations, and failed to give notice of petitioner's alibi witnesses until the day of trial.

Furthermore, the state's argument wholly fails to account for the failure to notify the prosecution regarding petitioner's sister.  At the hearing on the morning of trial, Sibley stated that petitioner had told Reid that his sister would be an alibi witness but provided no explanation for why neither he nor Reid provided notice that she would testify as an alibi witness on petitioner's behalf.  Again, petitioner surely knew her address; she stated that he lived with her.

The Court finds that petitioner has demonstrated that his counsels' performance, because of their failure to investigate his potential alibi and to notify the prosecution of such alibi, fails to meet the constitutional minimum guaranteed by the Sixth Amendment.

### F. Harmlessness and Prejudice

As noted above in the discussion of the trial court's constitutional error in precluding the alibi testimony of Mammie Lee Gails and Samantha Stewart, a violation of a defendant's right to present witnesses on his own behalf does not constitute reversible error if such error was harmless.  *Mitzell*, 88 F.3d at 295.  On federal habeas review, the Court must determine whether

25

the constitutional error had a "substantial and injurious effect or influence on the jury's verdict." *Brecht v. Anderson*, 507 U.S. 619, 623 (1993).[14]   This standard is "more forgiving" to the state criminal process than that elucidated in *Chapman*.  *Fry*, 127 S.Ct at 2325.  *Chapman* holds that on direct review of an error in a state criminal proceeding by a higher state court, the prosecution must prove that the error was harmless beyond a reasonable doubt.  386 U.S. at 24.  The Supreme Court refined the *Brecht* standard in *O'Neal v. McAninch*, 513 U.S. 432 (1995), holding that where a federal habeas court reviewing a state court error for harmlessness is in "grave doubt" about whether or not such error had a substantial and injurious effect or influence on the jury's verdict, the petitioner must win. *Id.* at 436; *see also  Tucker v. Johnson*, 242 F.3d 617, 629 (5th Cir. 2001) (quoting *Woods v. Johnson*, 75 F.3d 1017 (5th Cir. 1996)).

In addition, the Court must also determine whether petitioner has made a showing of prejudice under his ineffectiveness of counsel claim.   That is, whether in the context of the total trial, but for counsels' errors, there is a reasonable probability that the ultimate result would have been different, and that confidence in the reliability of the verdict is undermined.  *See Little*, 162 F.3d at 860-61.   The Eighth Circuit has held that, in a case involving constitutionally defective performance of counsel for failure to provide alibi notice, prejudice can be shown "by demonstrating that the uncalled alibi witnesses would have testified if called at trial and that their testimony would have supported [defendants'] alibi."  *Grooms*, 923 F.2d 88.  A showing of prejudice under such a test would readily be met by petitioner in this case; both of the witnesses

---

[14] The Supreme Court recently clarified, against a backdrop of significant confusion among the federal courts of appeals, that this harmlessness standard, and not a standard based on the combination of that set forth in *Chapman v. California*, 386 U.S. 18 (1967) and in 28 U.S.C. § 2254(d)(1), still applies to federal collateral review of constitutional errors in state courts, post-AEDPA.  *Fry v. Pliler*, -- U.S. --, 127 S.Ct. 2321, 2325 (2007); *see Burbank v. Cain*, 2007 WL 2809996 (E.D. La., 9/24/2007) (Berrigan, J.).

26

were present at trial, and did in fact testify, though they were restricted from any testimony concerning alibi.  And all indications are that they would have testified in support of petitioner's alibi (see discussion below).   However, this test, by itself, does not take into account the place of the alibi witnesses' testimony in the context of the entire trial.[15]

The two inquiries, whether the trial court's error in precluding alibi testimony was not harmless, and whether the constitutional deficiency in counsel's failure to investigate alibi witnesses and give notice of such witnesses were prejudicial, will be substantially the same in this case.[16]  Without either the trial judge's error or counsel's deficiency, petitioner would have presented alibi witnesses who would have testified that he could not have committed the crime. In order to determine whether these witnesses absence had a substantially and injurious effect on the outcome, or whether there is a reasonable probability that the ultimate result would have been different had they testified, the Court must examine the likely impact of their testimony in the context of the state's entire case.

The Court summarized the evidence presented by the state at trial in its discussion of petitioner's insufficiency of the evidence claim, above.  The petitioner was identified by two eyewitnesses at trial, the victims of the robbery, Brantley and Duhe.  Though the Court notes the

---

[15]   Although the leading Fifth Circuit opinion, *Bryant*, cited *Grooms* favorably multiple times, there the court remanded to the district court for a determination of whether counsel's defective performance prejudiced the defendant's case.  28 F.3d at 1419-20.  Under the *Grooms* test, the Fifth Circuit would likely have been able to determine that the defendant was prejudiced, without remand.  The fact that it did not suggests that it envisioned a fuller consideration of the total context of the trial, beyond merely whether the witnesses would have testified and whether there testimony would have been favorable to the defendant.

[16]   The Seventh Circuit has applied the *Brecht* standard as the prejudice test in its consideration of an ineffectiveness of counsel claim under *Strickland* on federal habeas review.  *Taylor v. Bradley*, 448 F.3d 942, 950 (7th Cir. 2006).  The Court need not, and does not, make a determination that the tests are legally equivalent; it only notes that the factors relevant to each test and their application in this case are substantially the same.

now generally-accepted weaknesses that often mar eyewitness identification,[17] in this case there

are some factors that tend to support the reliability of the identifications.  The two victims

independently, and rather quickly, identified petitioner's photograph when shown a lineup in

which it was first included.[18]  The police included petitioner's photograph as the result of

investigation which connected him to a car that matched the description of one that was seen by

two other witnesses in the vicinity of the robbery very soon after it occurred.[19]

---

[17] *See e.g., U.S. v. Wade*, 388 U.S. 218 (1967) ("The vagaries of eyewitness identifications are well-known; the annals of criminal law are rife with instances of mistaken identification."); *U.S. v. Moore*, 786 F.2d 1308, 1312 ("Expert testimony on eyewitness reliability is not simply a recitation of facts available through common knowledge. Indeed, the conclusions of the psychological studies are largely *counter-intuitive,* and serve to "explode common myths about an individual's capacity for perception …" For example, it is commonly believed that the accuracy of a witness' recollection increases with the certainty of the witness. In fact, the data reveal no correlation between witness certainty and accuracy. Similarly, it is commonly believed that witnesses remember better when they are under stress. The data indicate that the opposite is true. The studies also show that a group consensus among witnesses as to an alleged criminal's identity is far more likely to be inaccurate than is an individual identification. This is because of the effect of the "feedback factor," which serves to reinforce mistaken identifications") (internal citation omitted); *see* Jules Epstein, *The Great Engine That Couldn't: Science, Mistaken Identifications, and the Limits of Cross-Examination*, 36 STETSON L. REV. 727 (Spring 2007) (reviewing the scientific literature on the limitations on the reliability of eyewitness identification and legal acceptance of same, and discussing the limits of cross-examination to expose mistaken identification); *see generally* Wayne T. Westling, *The Case for Expert Witness Assistance to the Jury in Eyewitness Identification Cases*, 71 OR. L. REV. 93, 99-100, n.42-43 (Spring 1992) (collecting scientific and legal books and articles calling into question the basic human beliefs about the reliability of eyewitness testimony).  By noting the scientific research and legal acceptance of the frequent unreliability of eyewitness identifications, the Court does not comment on the particular photo or in-court identification procedures or circumstances of this case.  The petitioner does not raise claims related to the procedures here, and defense counsel did not seek to introduce expert testimony on the reliability of the eyewitness identifications at trial, although he does argue generally in his claim of insufficient evidence that the victims' eyewitness testimony is unreliable.  In this case, the jury was simply unable to even weigh the accuracy of the eyewitness identifications against the credibility of petitioner's alibi defense because his witnesses were precluded from giving alibi testimony.

[18] This factor, however, does implicate the possible impact of the "feedback factor" noted by the Fifth Circuit in Moore and discussed in the literature cited above, note 16.

[19] In his insufficiency of the evidence claim, petitioner raises the question of the accuracy of the witnesses' description of the offender. He states, "[t]he witnesses [sic] initial description was of a black male, 5'7" tall and weighing 175 pounds to the contradiction of a black male 6'1" and between 160-200 lbs.  The discrepancy between the witness' description and the reality of defendant's stature is significant.  Essentially, none of the eyewitnesses guessed at the correct height and weight of the defendant even though he was allegedly no more than three feet from the victims."  Rec. Doc. 1 at 13.  It is not clear from the record how tall and large petitioner actually was at the time of the trial (and the Court cannot tell if he is suggesting he is taller or shorter than the various descriptions given, though would guess he is suggesting he is generally taller than the descriptions given).  Duhe testified that he had initially described the robber as "around 5'10" or 5'9"."  State Rec. Vol. 4 at 262.  He recalled providing the officer with a weight of 200 lbs.  *Id.*  Officer Johnson, who first took a description from the victims just after the robbery,

However, no physical evidence was presented that tied petitioner to the robbery.  In addition, there was some inconsistency between the description of the man seen running from the area of the robbery to the car and that given by the victims.  The perpetrator was wearing panty hose over his face, albeit light in color, when the robbery itself occurred and he was closest to the victims.  As noted in note 18, above, there was at least some discrepancy between the descriptions given initially by the witnesses immediately after the crime was committed and those given at trial.  Petitioner was not himself the owner of the vehicle that matched the description of the one seen leaving the campus; the owner was apparently the girlfriend of a man who was a friend of the petitioner.  State Rec. Vol. 4 at 340-41.  Thus not only is petitioner's relationship to this car somewhat attenuated, it is also clear that other persons besides the owner had some access to it.

Although the Court has concluded that the evidence presented at trial by the state was sufficient to sustain a conviction under *Jackson v. Virginia*, it would not describe the case against petitioner as overwhelming.  On the other hand, it is impossible to tell how convincing

---

testified that both victims gave him a description of a black male, five foot eight.  *Id.* at 313, 315-16.  He testified that Duhe additionally stated that the robber was "approximately 170 pounds." *Id.* at 313, 316.  Broussard could not tell how tall the individual was he saw running to the car.  *Id.* at 283.  Curiously, Lambert testified that the man he saw run from the direction of the crime was "way taller than me.  He was about around six foot, I would have to say."  State Rec. Vol. 4 at 292.  Just minutes later, on cross-examination, and with no explanation for the discrepancy, Lambert stated that the man he saw running "looked fairly - he looked around my height, around 5'10"."  *Id.* at 302.  As it is not clear from the petition or the record how tall petitioner actually is, and thus, how great the discrepancy, if any, there is between his height and that reported by the victims immediately after the incident, the Court cannot comment on the significance of any possible discrepancy, and does not take it into account in evaluating harmlessness and prejudice.  However, if it is true that petitioner is significantly taller than the description given, that would only serve to weaken the state's case, and increase the prejudice suffered by petitioner by his inability to offer the alibi testimony of Gails and Stewart, in that their testimony might have been rendered more believable.  (Although the Court cannot determine how tall petitioner actually is from the record, it assumes that petitioner's height was a fact readily discernable by the jurors at trial, as he was present before them.)  The discrepancy between the description initially given by Duhe and Brantley, and the one at least Duhe recalled giving to Officer Johnson when he testified at trial, though not large, is apparent from the record.

the testimony of Gails and Stewart would have been, which is of course the province of the jury.

Beyond that, while there is some indication in the record of what the women would have testified

to, that indication is limited.  Officer Price, the prime investigator of the case, testified that

Stewart had come to him on the day petitioner was arrested and told him she was with petitioner

every night that week and could not have committed the offense.  *Id.* at 351-52.  He also testified

that Gails, petitioner's sister, had given Price information on another possible suspect, with

whom Price said he was never able to meet.  *Id.* at 352.  Out of the presence of the jury at a

bench conference at which the trial judge was attempting to discern the scope of what Gails

could testify to (in light of his ruling precluding any testimony concerning alibi), Gails stated

that she had left her house at approximately 10:45 or 10:50 on the night of the robbery to go to

work, not long before the crime.  *Id* at. 398-99.  Her brother was still at her house, such that she

thought it would have been impossible for him to make it to Southeastern University, where the

crime occurred, in time to have been the perpetrator.  *Id.* at 398.  In addition, as she was leaving

she saw Stewart arrive, which would have corroborated Stewart's likely testimony that he was

with her at the time of the robbery.  *Id.* at 399.

        In this case, petitioner's alibi, along with a theory of misidentification, was his entire

defense.  Unlike in *Mitzell*, where the Fifth Circuit determined that the erroneously precluded

testimony would have been cumulative and that therefore the preclusion was harmless, the

precluded testimony here was both central and necessary to petitioner's defense of alibi.  *Cf.*

*Mitzell*, 88 F.3d at 295.  While the jury did hear Price's testimony concerning Gails' and

Stewart's statements to him that petitioner could not have committed the crime, this was not

30

admitted as substantive evidence but rather in a description of the course of his investigation. The jury likely viewed the indirect testimony that petitioner's sister and girlfriend did not believe he could have done it as dubious.  Indeed, the fact that Price testified that Stewart and Gail had made statements to him regarding petitioner's ability to have committed the robbery likely created an expectation in the minds of the jurors that went unfulfilled when they did not testify as to their version of events.  In the end, the jury only knew that they had told Price a story, but did not tell them.   There was no explanation for the discrepancy, despite the fact that they both took the stand and testified.[20]  This likely undermined, in a subtle way, any credibility that they had.[21]   Although the jury may have viewed the testimony of petitioner's sister and girlfriend with  skepticism even if they had testified as to alibi, their personal demeanor while testifying, unheard details of their accounts, and any other indications of truthfulness or lack thereof would have been essential to the jury's assessment of their credibility.[22]  The Court imagines that in such a case, the witnesses could only have overcome a jury's natural skepticism by proving themselves credible, rather than being presumed so.  But this only increases the importance of their live testimony to petitioner's defense.

---

[20] The central thrust of the testimony defense counsel elicited from each of them was that they did not know petitioner to own clothes like those seen on the perpetrator by the victims, and that he had tattoos on his upper arm and chest.

[21] The trial judge recognized the awkwardness that Price's testimony about Gails' and Stewart's statements to him, in the absence of their testimony about the basis of those statements, created.  State Rec. Vol. 4 at 393-96. He framed it as such: "I can't let [the district attorney] put on evidence and [petitioner] not have an opportunity to challenge that evidence." *Id.* at 394.  The prosecutor rightly noted that the defense would not want to impeach the officer's testimony: "To challenge the evidence that the officer said, he would have to come forward and bring witnesses saying what the officer said is not true to challenge it, which would in effect destroy the alibi." *Id.*  The trial judge then ruled that he would give defense counsel a "little leeway" as to the two witnesses, only as to what was brought in by the state previously.  *Id.* at 396.  In the end, the "leeway" amounted to almost nothing at all, and nothing as to alibi testimony.  *Id.* at 399.

[22] Even though Gails and Stewart were disallowed from providing testimony as to petitioner's alibi, they were both impeached on the basis of bias anyway.  State Rec. Vol. 4 at 402, 405-408.

The Court notes again that the question before it in determining the harmlessness or prejudice of the errors is not one of sufficiency of the evidence. The *Brecht* Court adopted the harmless error standard from *Kotteakos v. U.S.*, 328 U.S. 750 (1946). *Brecht*, 507 U.S. at 637-38. Under such a standard, it is not this Court's function to "determine guilt or innocence .... Nor is it to speculate upon probable reconviction and decide according to how the speculation comes out." *Kotteakos*, 328 U.S. at 763. While the Court cannot escape such impressions, they may not be the sole criteria for reversal or affirmance. *Id.* The Court may consider the outcome at trial, but the question is not whether the jury was right or wrong in its judgment, regardless of the error or its effect upon the verdict. *Id.* at 764. Rather, the question is "what effect the error had or reasonably may be taken to have had upon the jury's decision." In other words, the "crucial thing is the impact of the thing done wrong on the minds of other men, not on [the Court's] own, in the total setting." *Id.*

> If, when all is said and done, the conviction is sure that the error did not influence the jury, or had but very slight effect, the verdict and the judgment should stand .... But if one cannot say, with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error, it is impossible to conclude that substantial rights were not affected. The inquiry cannot be merely whether there was enough to support the result, apart from the phase affected by the error. It is rather, even so, whether the error itself had substantial influence. If so, or if one is left in grave doubt, the conviction cannot stand.

*Kotteakos*, 328 U.S. at 764-65.

This is not a case where the evidence of petitioner's guilt was so overwhelming that the Court can readily conclude the lack of the alibi witness testimony did not have a substantial and

32

injurious effect or influence on the jury's verdict or that there is not a reasonable possibility that the outcome would have been different.  Critical alibi testimony was withheld from the jury because of serious constitutional trial errors.  The Court therefore concludes that the error was not harmless.  The Court also concludes that petitioner has shown that his counsel's failure to investigate alibi witnesses and give notice of alibi to the district attorney did prejudice petitioner, in that there is a reasonable probability that but for the constitutional deficiency, the outcome of the proceedings would have been different.[23]

## IV. CONCLUSION

For the reasons stated above, the Court finds that Willie Lee Moore Toney's petition for a writ of habeas corpus filed pursuant to 28 U.S.C. § 2254 is GRANTED.

 Accordingly, IT IS ORDERED that the conviction and sentence of WILLIE LEE MOORE TONEY be hereby set aside.  IT IS FURTHER ORDERED that the state either retry WILLIE LEE MOORE TONEY within 120 days of this order or dismiss the charges.  The state shall notify the Court and the defense of its intention within 30 days of this ruling.   Judgment will be entered accordingly.

New Orleans, Louisiana, this 3rd day of June, 2008.

HELEN G. BERRIGAN
UNITED STATES DISTRICT JUDGE

---

[23] The Court notes that even without the testimony of petitioner's alibi witnesses, one juror voted for acquittal.  State Rec. Vol. 4 at 413.  Under Louisiana law, petitioner would only have needed to convince two other jurors to have been acquitted.  LA.CONST. Art. 1, § 17.